**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROBERT WILLIAMS, SR.; ROBIN
FLEMING; LAVONIA WILLIAMS;
PAYNE CARE CENTER; KINGSLEY
HOME CARE; ROBERT WILLIAMS, II,
*Plaintiffs-Appellants*,

v.

STATE OF CALIFORNIA; SAN
GABRIEL POMONA REGIONAL
CENTER; CLAIRE MATSUSHITA, in
her individual and official capacities;
R. KEITH PENMAN, in his individual
and official capacities; CLAUDIA
HEMINGWAY, in her individual and
official capacities; ADRIANE PICAZO,
in her individual and official
capacities; LUCIANA GALARZA, in
her individual and official capacities,
*Defendants-Appellees*.

No. 12-55601

D.C. No.
2:11-cv-04803-
GHK-AGR

OPINION

Appeal from the United States District Court
for the Central District of California
George H. King, Chief District Judge, Presiding

Argued and Submitted
October 10, 2013—Pasadena, California

Filed August 19, 2014

Before: Harry Pregerson, Kim McLane Wardlaw,
and Richard C. Tallman, Circuit Judges.

Per Curiam Opinion

---

## SUMMARY[*]

---

### Civil Rights

The panel affirmed the district court's dismissal and adopted the district court's disposition in an action brought pursuant to 42 U.S.C. § 1983 by two residential community care facilities and their employees alleging violations of their First Amendment right to freedom of religion when they were forced to provide direct staff support to a developmentally disabled client who wished to attend Jehovah's Witness services.

Plaintiff named as defendants Claire Matsushita, Regional Manager of the Community Care Licensing Division of the California Department of Social Services, and a regional community agency and its employees that contracted with the state to assist in implementation of California's Lanterman Developmental Disabilities Services Act, a statutory scheme enacted by the California legislature to provide services for developmentally disabled persons.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel affirmed (1) the district court's dismissal of plaintiffs' complaint against Matsushita because plaintiffs failed to allege specific facts against Matsushita other than to identify her title; (2) the district court's holding that defendants' interpretation of the Lanterman Act and its regulations did not violate the First and Fourteenth Amendments; and (3) the district court's denial of leave to amend because of futility of amendment.

## COUNSEL

Leo J. Terrell (argued), Beverly Hills, California, for Plaintiffs-Appellants.

Jeffrey Whittington (argued), Nicholas W. Sarris, Kaufman Borgeest & Ryan LLP, Calabasas, California, for Defendants-Appellees San Gabriel Pomona Regional Center, R. Keith Penman, Claudia Hemingway, Adriane Picazo, and Luciana Galarza.

Donna M. Dean (argued), Deputy Attorney General, Office of the California Attorney General, Los Angeles, California, for Defendant-Appellee Claire Matsushita.

**OPINION**

PER CURIAM:

Plaintiffs — Payne Care Center, Kingsley Home Care Center, and their named employees — appeal from the district court's dismissal of their 42 U.S.C. § 1983 complaint. The complaint alleges that Defendants violated Plaintiffs' First Amendment right to freedom of religion by forcing them to provide direct staff support to a developmentally disabled client who wished to attend Jehovah's Witness services.

After carefully reviewing the briefs and record, and reviewing de novo the district court's conclusions of law, we affirm: (1) the district court's dismissal of Plaintiffs' complaint against Defendant-Appellee Claire Matsushita because Plaintiffs failed to allege specific facts against Matsushita other than to identify her title; (2) the district court's holding that Defendants' interpretation of the Lanterman Act, Cal. Welf. & Inst. Code §§ 4500–4906, and its regulations, did not violate the First and Fourteenth Amendments; and (3) the district court's denial of leave to amend because of futility of amendment.

We commend the district court for its thoughtful and legally correct approach to this case. We thus adopt the district court's well-reasoned and comprehensive disposition, *Williams v. California*, 990 F. Supp. 2d 1009 (C.D. Cal. 2012), and incorporate it here. We attach the disposition as Appendix A.

**AFFIRMED.**

**APPENDIX A**

990 F.Supp.2d 1009
United States District Court,
C.D. California.

Robert WILLIAMS, Sr., et al., Plaintiffs,
v.
State of CALIFORNIA, et al., Defendants.

Case No. CV 11–4803–GHK (AGRx). | Signed March 23, 2012.

**Synopsis**
**Background:** Residential community care facilities brought action against regional community agency that contracted with state to assist in implementation of California's Lanterman Developmental Disabilities Services Act, and its officials, alleging that agency's citation of facilities for refusing to accompany a patient to religious services violated First Amendment and Title VII. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, George H. King, J., held that:

[1] agency's interpretation of Lanterman Act's provision governing religious rights was consistent with Act's purpose;

[2] provision governing religious rights was facially neutral;

[3] provision governing religious rights did not violate Free Exercise Clause of First Amendment;

[4] provision governing religious rights did not violate Establishment Clause of First Amendment;

[5] facilities failed to state a claim of First Amendment retaliation;

[6] facilities failed to state a claim under Title VII; and

[7] facilities were not entitled to leave to amend complaint a second time.

Motions granted.

**Attorneys and Law Firms**

**\*1012** Leo James Terrell, Law Offices of Leo James Terrell, Los Angeles, CA, for Plaintiff/Petitioner/Appellant.

Nicholas W. Sarris, Peckar & Abramson, P.C., Los Angeles, CA, Donna M. Dean, Office of Attorney General, Los Angeles, **\*1013** CA, for Defendant/Respondent/Appellee.

**Opinion**

### ORDER RE: MOTIONS TO DISMISS

GEORGE H. KING, District Judge.

This matter is before the Court on (1) Defendants San Gabriel/Pomona Regional Center, R. Keith Penman, Claudia Hemingway, Adriane Picazo, and Lucina Galarza's Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to F.R.C.P. 12(b)(6), and (2) Defendant Claire Matsushita's Motion to Dismiss Plaintiffs' Complaint (collectively, "Motions"), We have considered the arguments in support of and in opposition to these Motions and deem this matter appropriate for resolution without oral argument. L.R. 7–15. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows.

## I. Statutory Framework

California's Lanterman Developmental Disabilities Services Act ("Lanterman Act" or "Act") serves as the backdrop of this case. The Act is a comprehensive statutory scheme enacted by the California legislature to provide services for developmentally disabled persons. Its purpose is "to prevent or minimize the institutionalization of developmentally disabled persons ... and to enable them to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community." *Ass'n for Retarded Citizens v. Dep't of Dev. Servs.,* 38 Cal.3d 384, 388, 211 Cal.Rptr. 758, 696 P.2d 150 (1985) ("*ARC* ").

The Act recognizes that developmentally disabled persons not only "have the same legal rights and responsibilities [as those] guaranteed all other individuals by the United States Constitution and laws of the State of California," but it also grants them certain statutory rights, including the right to treatment and re-habilitation services at state expense, and—of particular importance in this case—the right to religious freedom and practice, the right to attend religious services or to refuse attendance, and the right to participate in worship or not to participate in worship, Cal Welf. & Inst.Code §§ 4502–03; Cal, Code Regs. tit. 17, § 50510(a)(4).

To implement these rights and the corresponding obligations of the State, the Act fashions "a system in which both state agencies and private entities have functions." *ARC,* 38 Cal.3d at 389, 211 Cal.Rptr. 758, 696 P.2d 150. The Department of Developmental Services ("DDS"), a state agency, "has jurisdiction over the execution of the laws relating to the care, custody and treatment of developmentally disabled persons," Cal. Welf, & Inst.Code § 4416, and the authority to enact regulations in pursuit of the Act's goals, *id.* § 4406. However, DDS itself does not coordinate services for individual developmentally disabled persons. To coordinate such services, the Act provides that DDS must contract with " 'regional centers,' operated by private nonprofit community agencies under contract with DDS." *ARC,* 38 Cal.3d at 389, 211 Cal.Rptr. 758, 696 P.2d 150. Regional centers are responsible for locating developmentally disabled persons, assessing their needs, and—on an individual basis—selecting and providing services to meet such needs. *See* Cal. Welf. & Inst.Code §§ 4641, 4642–43, and 4646–47, respectively. The State funds the regional centers, which must comply with numerous state regulations. *See id.* §§ 4621, 4629(a)-(b).

Regional centers do not provide developmentally disabled persons with services directly. Instead, after determining the services a patient needs, regional centers **\*1014** select and contract with community-based service providers, including "vendors," to ultimately provide services. *See Sanchez v. Johnson,* 416 F.3d 1051, 1064–65 (9th Cir.2005); Cal. Welf. & Inst.Code § 4648. Regional centers are charged with monitoring vendors to ensure that services are provided in compliance with their contracts and applicable state laws and regulations.

## II. Factual Background

On December 2, 2011, Plaintiffs Payne Care Center, Kingsley Home Care, Robert Williams, Sr., Robin Fleming, Robert Williams, II, and Lavonia Williams (collectively, "Plaintiffs") filed a First Amended Complaint ("FAC") against Defendants San Gabriel/Pomona Regional Center ("SOP Regional Center"), Claire Matsushita (erroneously sued as Claire Matsushi), R. Keith Penman, Claudia Hemingway, Adriane Picazo, and Lucina Galarza (collectively, "Defendants").

Plaintiffs Payne Care Center and Kingsley Home Care are six-bed residential community care facilities that are licensed by the California Department of Social Services Community Care Licensing Division, (FAC ¶¶ 10–11, 29), and serve as vendors under the Lanterman Act, Plaintiff Robert Williams, Sr. is the owner of Payne Care Center and Kingsley Home Care. (*Id.* ¶ 6), Plaintiffs Robin Fleming, Robert Williams, II, and Lavonia Williams are employees of Payne Care Center (collectively, "Payne employees"). (*Id.* ¶¶ 7–9),

Defendant SGP Regional Center is a "regional center" established pursuant to the Lanterman Act. (*Id.* ¶ 28). Defendants R. Keith Penman, Claudia Hemingway, Adriane Picazo, and Lucina Galarza are employees of SGP Regional Center (collectively, "Employee Defendants").[1] (*Id.* ¶¶ 14–17). Defendant Claire Matsushita is the Regional Manager of the Community Care Licensing Division of the California Department of Social Services. (*Id.* ¶ 13).

[1]     We refer to SGP Regional Center and Employee Defendants collectively as "SGP Defendants."

Plaintiffs allege that sometime in June 2009, a meeting was held at SGP Regional Center to address behavioral issues with one of Payne Care Center's clients, C.W. (*Id.* ¶ 40). "During the course of this meeting, it came to Plaintiff Payne's attention that C.W. had expressed some level of desire to attend ... Jehovah's Witness worship services...." (*Id.*).

Plaintiffs further allege that between July and September 2009, additional "meetings involving Plaintiff Payne, [SGP Regional Center], C.W.'s parents, and Defendant Adriane Picazo, among others, were held to discuss C.W.'s request." (*Id.* ¶ 41). Due to his disability, C.W. was unable to attend the religious services without assistance. (*Id.* ¶ 42). During the meetings, Payne Care Center stated that "it would facilitate C.W.'s request through transportation and introduction to members of the church in the community." (*Id.* ¶ 41). However, Plaintiffs allege that "Defendants, and each of them, notified Plaintiffs that C.W. must be given the opportunity to attend the Jehovah's Witness services," and "erroneously indicated that Plaintiffs were required to accompany C.W. to these religious services." (*Id.* ¶ 43).

Plaintiffs disagreed and did not believe that they were obligated to "personal[ly] accompan[y]" clients to religious services, but instead were only obligated to provide an opportunity for clients to attend such services. (*Id.* ¶ 44). During one of the **\*1015** meetings, Payne Care Center "expressed its concerns with [SGP Regional Center's] directive that Payne Care Center employees accompany C.W. to religious services, particularly because of Plaintiff Payne's potential exposure to liability under Title VII of the Civil Rights Act of 1964 if it forced its employees ... to attend religious services with C.W." (*Id.* ¶ 45). Despite Plaintiffs' objections, SGP Regional Center insisted that Payne Care Center employees accompany C.W. to religious services. (*Id.* ¶ 46).

On an unspecified date, Payne Care Center received a letter from Defendant Picazo, SGP Regional Center's Client Services Manager, stating that

> she had consulted with the California Community Care Licensing Division about whether [Payne Care Center] employees should be required to attend religious services with clients, and ... that the Licensing Division confirmed that, per California Code of Regulations Title 22, section 85079, a licensed Adult Residential Facility is to provide direct staff support and not just the opportunity for a disabled adult to actively participate in worship services. Defendant Picazo further stated ... that because of C.W.'s behavioral challenges ..., [Payne Care Center] staff was required to accompany C.W. while he attended worship services.

(*Id.* ¶ 47).

After receiving this letter, Payne Care Center contacted the California Community Care Licensing Division and requested a legal opinion "as to whether Plaintiff Payne would need to force its employees to attend worship services with clients." (*Id.* ¶ 49). The Community Care Licensing Division did not provide a legal opinion. (*Id.*). Plaintiffs did not accompany C.W. to any Jehovah's Witness services and, as a result, "the State of California and [SGP Regional Center] cited Plaintiffs for violating their obligations to a client." (*Id.* ¶ 49).

Plaintiffs allege that because of the citation Payne Care Center and Kingsley Home Care no longer receive client referrals from the State and SGP Regional Center and, therefore, have received less funding from the State. (*Id.* ¶¶ 50–51), Payne Care Center and Kingsley Home Care "are now contemplating bankruptcy." (*Id.* ¶ 52),

Finally, Plaintiffs allege that "certain employees" of Payne Care Center "have expressed their intentions to refuse to fulfill any order to attend any Jehovah's Witness service because attendance of any such service would be in contradiction to those employees' own religious beliefs and practices." (*Id.* ¶ 53). Specifically, Plaintiffs allege that "two [Payne Care Center] employees are Catholic and maintain that their Catholic faith restricts them from attending any other religious service unless that service is a wedding or funeral, and another [Payne Care Center] employee refuses to attend or participate in *any* religious service." (*Id.*).

Based on these allegations, Plaintiffs assert two claims under 42 U.S.C. § 1983:(1) deprivation of the right to freedom of religion under the First Amendment, and (2) unlawful retaliation in response to Plaintiffs' assertion of their right to freedom of religion under the First Amendment.

### III. Legal Standard for Motion to Dismiss Under Rule 12(b)(6)

To survive dismissal for failure to state a claim, a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). It must **\*1016** contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955; *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In considering a motion to dismiss, we must accept the allegations of the complaint as true and construe them in the light most favorable to the plaintiff. *Cousins v. Lockyer,* 568 F.3d 1063, 1067 (9th Cir.2009).

### IV. Analysis

The theories underlying Plaintiffs' claims have suffered from a lack of clarity from the outset of this case. On August 4, 2011, Employee Defendants filed a motion to dismiss ("August 4 Motion") Plaintiffs' initial Complaint. In that motion, they argued among other things that Plaintiffs failed to plead facts demonstrating a violation of the First Amendment's Free Exercise or Establishment Clauses, On September 20, 2011, we issued an Order noting that Plaintiffs' Opposition to Employee Defendants' August 4 Motion "entirely fail [ed] to address" this argument. (Dkt. No. 28). We noted that we could "deem Plaintiffs' non-opposition [to this argument] as consent to granting the relief sought." However, we instead "cho[ ]se not to do so ... and ... allow [ed] Plaintiffs one last opportunity to respond to this unaddressed argument." (Dkt. No. 28, at 1).

On October 4, 2011, Plaintiffs filed a Supplemental Opposition to Employee Defendants' August 4 Motion ("Supplemental Opposition"), which responded to Employee Defendants' attack on the sufficiency of Plaintiffs' claims under the First Amendment. On October 27, 2011, we issued an Order wherein we noted that the theories asserted by Plaintiffs in their Supplemental Opposition were "unclear." (Dkt. No. 38, at 1). We further noted that Plaintiffs' Supplemental Opposition appeared to rely on factual allegations that were "entirely absent from the Complaint." (*Id.*). Accordingly, we granted Employee Defendants' August 4 Motion and dismissed the Complaint. We also granted Plaintiffs leave to file a FAC "so they [could] plead their claims clearly and allege facts in support of each claim." (*Id.*).

Plaintiffs filed their FAC on December 2, 2011. Defendants subsequently filed the present Motions, which argue—among other things—that the facts alleged in the FAC do not amount to a violation of the First Amendment. Unfortunately, Plaintiffs have not made an earnest effort to respond to these arguments, as they have merely "cut and paste" the arguments from their Supplemental Opposition into their oppositions to the present Motions. As noted above, we had previously indicated to Plaintiffs that we found these theories to be "unclear."

Needless to say, the theories asserted in the FAC and Plaintiffs' papers filed in opposition to the present Motions remain unclear and exhibit complete carelessness on behalf of Plaintiffs in litigating this case. For example, Plaintiffs' Opposition to SOP Defendants' Motion begins by summarizing the changes Plaintiffs have made in the FAC. Plaintiffs state that "Plaintiffs has [sic] also modified the Caption of the Complaint to omit Defendant San Gabriel/Pomona Regional Center as a named defendant because Plaintiffs do not intend on serving Defendant SG/PRC with [sic] Summons and Complaint." (Opp'n, Dkt. No. 51, at 4). However, an examination of the FAC reveals no such modification, as SGP Regional Center is still listed as a Defendant in the caption of the FAC and the allegations in the FAC frequently refer to "*Defendant* SG/PRC." (*See* FAC ¶ 18 (emphasis added)). Additionally, later in their Opposition to SGP Defendants' Motion, **\*1017** Plaintiffs abandon their representation—which they made only pages earlier—that they intend to omit SGP Regional Center as a Defendant. Plaintiffs state, "Further due diligence, discovery, and research have revealed Defendant SG/PRC as a necessary party to this suit.... Therefore, Plaintiffs respectfully request that this Court not dismiss Defendant SG/PRC as a party to this suit." (Dkt. No. 51, at 23). This request is completely nonsensical in light of Plaintiffs' previous representation that they omitted, and do not intend to serve, SGP Regional Center.

Additionally, Plaintiffs' Opposition argues that "Plaintiffs have plead [sic] sufficient facts to establish a claim for violations of Title VII of the Civil Rights Act." (Dkt. No. 51, at 27). However, we note that Plaintiffs' FAC asserts only two claims, and neither claim is for a "violation[ ] of Title VII." Plaintiffs end this portion of their Opposition stating, "Plaintiffs allege the facts included above related to Title VII and ask leave of the Court to amend the complaint to include facts related to Title VII claims." (Dkt. No. 51, at 29). Plaintiffs previously included this exact sentence in their Supplemental Opposition, which was filed on October 4, 2011. At that time, we granted Plaintiffs' request for leave to amend the Complaint to assert new theories and claims. The fact that Plaintiffs entirely failed to take advantage of this opportunity to plead their purported Title VII claim is inexcusable, and we see no reason to grant Plaintiffs leave to amend a second time.

**[1]** Finally, we note that with respect to a number of the Defendants Claire Matsushita, [2] R. Keith Penman, and Lucina Galarza Plaintiffs have alleged nothing more than their names and their employment positions. Plaintiffs have made no allegations whatsoever as to how these Defendants were involved in any alleged constitutional violation. Such allegations are insufficient to state a claim against these Defendants under § 1983. *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir.1988) (holding that liability may be imposed on individual defendant under § 1983 only if plaintiff can show that defendant proximately caused deprivation of federally protected right).

[2]     Throughout their FAC and opposition papers, Plaintiffs erroneously refer to Defendant Matsushita as "Claire Matsushi" and "Claire Matsushida." This is just one more example of Plaintiffs' utter carelessness in drafting and presenting papers to this Court.

In the event of dismissal, Plaintiffs have again asked for leave to amend. [3] As explained in more detail below, we believe that granting leave to amend the above-mentioned deficiencies would be futile because none of the conduct alleged in the FAC, even taken in the light most favorable to Plaintiffs, amounts to a constitutional violation.

[3]     In Plaintiffs' Opposition to Matsushita's Motion, they have completely failed to respond to any of Matsushita's arguments for dismissal. Instead, they appear to rest entirely on having the opportunity to again amend the Complaint. To this effect, Plaintiffs state, "Plaintiffs have already agreed to stipulate to amend the FAC to satisfy all the issues raised in Defendant [Matsushita's] Motion to Dismiss the FAC." (Dkt. No. 52). However, it is clear that Matsushita has not agreed to such amendment as she argues that "amendment of the complaint would be futile." (Dkt. No. 49, at 15). Moreover, Plaintiffs have not demonstrated nor even offered a sufficient basis for being granted leave to amend under Federal Rule of Civil Procedure 15.

### A. *Claim 1: Deprivation of the Right to Freedom of Religion Under the First Amendment*
**[2]** "To make out a cause of action under section 1983, plaintiffs must plead **\*1018** that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes." *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir.1986).

In Plaintiffs' first claim, they allege that Defendants, acting under color of state law, violated their rights [4] under the Establishment and Free Exercise Clauses of the First Amendment. Defendants move to dismiss Plaintiffs' claim on the ground that the facts alleged in the FAC do not amount to a violation of the First Amendment under either clause. [5]

[4] The Parties have not addressed whether Payne Care Center and Kingsley Home Care ("Entity Plaintiffs") may assert their own rights to freedom of religion. However, for purposes of deciding this Motion only, we will assume that the Entity Plaintiffs may assert their own rights or, in the alternative, have standing to assert the rights of their owner, Robert Williams, Sr. *See Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1119 (9th Cir.2009) ("We decline to decide whether a for-profit corporation can assert its own rights under the Free Exercise Clause and instead examine the rights at issue as those of the corporate owners."): *id.* at 1120 ("We have held that a corporation has standing to assert the free exercise right of its owners.").

[5] SOP Defendants also move to dismiss Plaintiffs' claims on the ground that they are not state actors. However, because Plaintiffs have failed to establish that even if SGP Defendants are state actors—their right to freedom of religion was violated, we decline to address this additional argument for dismissal.

[3] Before addressing the sufficiency of Plaintiffs' claims, we must first address Plaintiffs' allegation that "Defendants erroneously indicated that Plaintiffs were required to accompany C.W. to ... religious services." (FAC ¶ 43). Through this allegation, Plaintiffs appear to argue that Defendants erroneously interpreted § 85079 of Title 22 of the California Code of Regulations to require Plaintiffs to provide direct staff support to clients who wish to attend religious services. Plaintiffs do not offer any arguments as to why Defendants' interpretation of this provision was "erroneous," and Plaintiffs do not explain the impact that an alleged erroneous interpretation of this provision would have on the viability of their First Amendment claims. However, for purposes of having a clear and focused analysis of Plaintiffs' First Amendment claims below, it is important that we determine whether Defendants' alleged conduct was consistent with, or in contravention of, the Lanterman Act and its corresponding regulations. This is a question appropriate for resolution on a motion to dismiss because the interpretation of a regulation is a question of law. *Culligan Water Conditioning v. State Bd. of Equalization,* 17 Cal.3d 86, 93, 130 Cal.Rptr. 321, 550 P.2d 593 (1976).

### 1. Plaintiffs' Obligations Under the Lanterman Act and Its Corresponding Regulations

Plaintiffs allege that Defendant Picazo—who had consulted with the Community Care Licensing Division of the Department of Social Services—erroneously instructed them that, pursuant to § 85079, they were required to provide direct staff support to clients who wished to attend religious services.

Section 85079(c) provides, in relevant part: "The licensee shall ensure that clients are given the opportunity to attend and participate in community activities including but not limited to the following: (1) Worship services and activities of the client's choice...." On its face, this provision does not explicitly state whether a vendor, such as Payne Care Center, is required to provide direct staff support in order to fulfill its obligation to provide clients with "the opportunity to attend and **\*1019** participate in [worship services]." However, the plain language of the regulation also does not foreclose such a requirement.

[4] "The interpretation of a regulation, like the interpretation of a statute, is ... a question of law...." *Culligan Water,* 17 Cal.3d at 93, 130 Cal.Rptr. 321, 550 P.2d 593 (quoting *Carmona v. Div. of Indus. Safety,* 13 Cal.3d 303, 310, 118 Cal.Rptr. 473, 530 P.2d 161 (1975)). "[A]n administrative agency's interpretation of its own regulation ... deserves great weight, [but] the ultimate resolution of legal questions rests with the courts," *Id.* (quoting *Carmona,* 13 Cal.3d at 310, 118 Cal.Rptr. 473, 530 P.2d 161).

[5] Here, Plaintiffs allege that the Community Care Licensing Division of the Department of Social Services has interpreted this provision to require vendors to provide direct staff support. As noted, we may give weight to this interpretation, but it is not conclusive.

**[6]**  Generally, "[i]n construing a statute the court [should] consider the purpose of the law and adopt a construction which will further that purpose." *Robinson v. Fair Emp't & Hous. Comm'n,* 2 Cal.4th 226, 234, 5 Cal.Rptr.2d 782, 825 P.2d 767 (1992), We conclude that construing § 85079(c) to require the provision of direct staff support to clients who wish to attend religious services is consistent with the purpose of the Lanterman Act, which is "to enable [developmentally disabled persons] to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community." *ARC,* 38 Cal.3d at 388, 211 Cal.Rptr. 758, 696 P.2d 150. Indeed, interpreting § 85079(c) to require direct staff support at religious services provides persons like C.W., who Plaintiffs themselves allege is "unable to attend ... religious services without assistance," (FAC ¶ 42), the ability to "approximate the pattern of everyday living of nondisabled persons," many of whom frequently attend religious services.

Furthermore, it is unclear how vendors, like Payne Care Center and Kingsley Home Care, could provide their clients with "the opportunity to attend and participate in" religious services without providing direct staff support, given that Payne Care Center and Kingsley Home Care are care facilities that "provide twenty-four hour services to their patients, who are developmentally disabled and in need of behavioral modification care." (*Id.* ¶ 30). The fact that Payne Care Center and Kingsley Home Care "provide twenty-four hour services" suggests that very few of their clients could attend religious services without direct staff support. Thus, the only way for Plaintiffs to provide these clients with a meaningful opportunity to attend religious services would be to accompany them to those services.

Finally, Plaintiffs acknowledge that they are "required to accompany or escort clients to recreational activities," (*Id.* ¶ 44), and provide no explanation as to why they believe this requirement does not extend to religious activities. Given that Plaintiffs acknowledge that the Lanterman Act's corresponding regulations require vendors to accompany clients to "recreational" activities, it seems illogical that those regulations would not also require vendors to accompany clients to religious services, especially when such an exemption for religious services is not explicitly stated anywhere in the Code.

Accordingly, we conclude that Defendant Picazo's alleged instruction that Plaintiffs must provide C.W. with direct staff support at Jehovah's Witness services was not based on an "erroneous" interpretation of § 85079(c). Thus, Defendants' alleged conduct was consistent with the **\*1020** Lanterman Act, and we construe Plaintiffs' claim to challenge the constitutionality of the regulations at issue here, [6] as opposed to individual action taken in contravention of those regulations.

[6]  We note that Defendants' alleged conduct (that is, instructing Plaintiffs that they must accompany C.W. to religious services and subsequently citing Plaintiffs for not fulfilling this obligation) is consistent with other regulations enacted pursuant to the Lanterman Act. For example, § 50510(a)(4) of Title 17 of the California Code of Regulations recognizes the right of developmentally disabled persons to "religious freedom, and practice, including the right to attend services or to refuse attendance, to participate in worship or not to participate in worship." Section 56057 provides that a "regional center shall apply sanction(s) to a [vendor] 'when; (1) a substantial inadequacy is not corrected.' " Section 56054 defines "substantial inadequacies" to include "violations of a [client's] rights." Additionally, § 54326(a)(7) provides that "[a]ll vendors shall ... [n]ot discriminate in the provision of services to consumers on the basis of ... religion." Because Defendants' alleged conduct was also consistent with these regulations, we consider the constitutionality of these regulations to also be at issue here.

### 2. The Merits of Plaintiffs' Claim

**[7]** **[8]**  The First Amendment provides that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The First Amendment is applicable to the states through the Fourteenth Amendment. *See Everson v. Bd. of Educ.,* 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The First Amendment's protection of the freedom of religion is considered to be embodied in two clauses: the "Establishment Clause" and the "Free Exercise Clause." These clauses constitute distinct protections but also embody "correlative and coextensive ideas, representing only different facets of the single great fundamental freedom [of religion]." *Id.* at 40, 67 S.Ct. 504 (Rutledge, J., dissenting). The Establishment Clause prohibits the Government from compelling an individual to participate in religion or its exercise, or otherwise from taking action that has the purpose or effect of promoting religion or a particular religious faith. *See Lee v. Weisman,* 505 U.S.

577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). The Free Exercise Clause guards an individual's practice of her own religion against restraint or invasion by the Government. *See Sch. Dist. of Abington Twp., Pa. v. Schempp,* 374 U.S. 203, 222–23, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). We address Plaintiffs' claims under each clause in turn.

### a. Free Exercise Clause

 **[9]**    **[10]**    **[11]**    In order to establish a violation of the Free Exercise Clause, a plaintiff must establish that the challenged conduct resulted in an impairment of the plaintiff's free exercise of genuinely held beliefs. *See United States v. Lee,* 455 U.S. 252, 256–57, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). However, in evaluating such a claim, we must be mindful that "every person cannot be shielded from all burdens incident to exercising every aspect of the right to practice religious beliefs." *Id.* at 261, 102 S.Ct. 1051. Indeed, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Emp't Div. v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *see also Christian Legal Soc. Chapter of the Univ. of Cal. Hastings Coll. of Law v. Martinez,* 561 U.S. 661, 130 S.Ct. 2971, 2995 n. 27, 177 L.Ed.2d 838 (2010) ("[T]he Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct.").

 **\*1021** **[12]**    Here, the relevant portions of the Lanterman Act and its corresponding regulations are neutral because their "object ... is [not] to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Instead, their object is to allow developmentally disabled persons to approximate the lives of nondisabled persons. Additionally, the laws serve to accommodate the rights of developmentally disabled persons to free exercise of religion, which is a legitimate secular purpose. *See Mayweathers v. Newland,* 314 F.3d 1062, 1068 (9th Cir.2002) ("protect[ing] the exercise of religion" is a legitimate "secular legislative purpose"); *cf. Church of Lukumi,* 508 U.S. at 533, 113 S.Ct. 2217 ("A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context.").

Furthermore, the regulations at issue are generally applicable. They apply to all clients and all vendors, irrespective of their religion (or lack thereof). *Cf. Church of Lukumi,* 508 U.S. at 543, 113 S.Ct. 2217 (holding that a law is not generally applicable when it "impose[s] burdens" "in a selective manner").

 **[13]**    When a law is neutral and generally applicable, it "will be upheld if [it is] rationally related to a legitimate governmental purpose." *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1137 (9th Cir.2009). Here, the regulations at issue, which are neutral and generally applicable, are rationally related to the legitimate governmental purpose of enabling developmentally disabled persons to approximate the daily lives of nondisabled persons. Accordingly, they do not run afoul of the Free Exercise Clause.

Although Plaintiffs have not advanced a coherent and lucid theory tying the conduct alleged in the FAC to a violation of the Free Exercise Clause, we note that Plaintiffs allege that "certain employees" of Payne Care Center "have expressed their intentions to refuse to fulfill any order to attend any Jehovah's Witness service because attendance of any such service would be in contradiction to those employees' own religious beliefs and practices." (FAC ¶ 53). Specifically, Plaintiffs allege that "two [Payne Care Center] employees are Catholic and maintain that their Catholic faith restricts them from attending any other religious service unless that service is a wedding or funeral, and another [Payne Care Center] employee refuses to attend or participate in *any* religious service." (*Id.*). Plaintiffs do not allege that these "certain employees" are any of the Plaintiffs themselves, but even if they were, Plaintiffs have not demonstrated a violation of the Free Exercise Clause on these facts.

We construe Plaintiffs' argument to be that the regulations at issue require them to engage in conduct that their religion prohibits: that is, being present at Jehovah's Witness services.[7] To this end, they seem to assert that the regulations impair the free exercise of their religious beliefs. However, similar claims have failed **\*1022** against neutral laws of general applicability because, as noted above, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law

of general applicability on the ground that the law ... prescribes ... conduct that his religion ... proscribes.' " *Smith,* 494 U.S. at 879, 110 S.Ct. 1595; *see also Lee,* 455 U.S. 252, 102 S.Ct. 1051 (rejecting challenge by Amish individuals who claimed that the requirement that they obtain Social Security Number and pay Social Security taxes violated their religious beliefs). In sum, "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *Lee,* 455 U.S. at 261, 102 S.Ct. 1051. Plaintiffs have not stated a violation of the Free Exercise Clause here.

7    We note that these regulations do not require vendors or their employees to hold any particular religious beliefs or to worship, engage in prayer, or otherwise participate in any religious services. Instead, they merely require vendors to provide care to developmentally disabled persons who themselves wish to participate in religious activity. Thus, we construe Plaintiffs' allegations to be that their religious beliefs (or lack thereof) prevent them from merely being present at a Jehovah's Witness service, even if the only reason they are present at that service is to provide care to a disabled client who wishes to participate in the service.

### b. Establishment Clause

The Establishment Clause of the First Amendment prohibits the Government from enacting a law "respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has said:

The "establishment of religion" clause of the first Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can ... force [a person] to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs.... [T]he [Establishment] [C]lause ... was intended to erect a "wall of separation between Church and State."

*Everson,* 330 U.S. at 15–16, 67 S.Ct. 504.

 **[14]**    However, subsequent cases have tempered *Everson* by acknowledging that church and State cannot be separate in all respects, as religion is a deeply embedded part of American life and culture. *See, e.g., Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Indeed, "[w]hile this clause forbids [the government] from advancing religion, the Supreme Court has interpreted it to allow, and sometimes require, the accommodation of religious practices; 'This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.' " *Mayweathers,* 314 F.3d at 1068 (quoting *Hobbie v. Unemp't Appeals Comm'n of Fla.,* 480 U.S. 136, 144–45, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987)). Thus, "[t]he touchstone for [the Court's] analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.' " *McCreary County, Ky. v. ACLU,* 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)).

 **[15]**    Establishment Clause violations are determined according to the three-pronged test articulated in *Lemon v. Kurtzman,* 403 U.S. at 612–13, 91 S.Ct. 2105 ("*Lemon* test"). A statute or regulation will survive an Establishment Clause attack if (1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion. *Id.* As explained below, we conclude that the regulations at issue survive this test.

### i. Secular Purpose

The first prong of the *Lemon* test inquires into the Government's actual motivation underlying the regulation in question **\*1023**  that is, whether it was intended to advance or inhibit religion. *See Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). A purpose to favor one faith over another, or adherence to religion generally, clashes with the

"understanding ... that liberty and social stability demand a ... tolerance that respects the religious views of all citizens." *Zelman v. Simmons–Harris,* 536 U.S. 639, 718, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002).

 **[16]**    However, "[t]he secular purpose requirement does not 'mean that the law's purpose must be unrelated to religion—that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted.' " *Mayweathers,* 314 F.3d at 1068 (quoting *Corp. of Presiding Bishop v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987)).

 **[17]**    Here, the Lanterman Act and its corresponding regulations were enacted to "enable [developmentally disabled persons] to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community." *ARC,* 38 Cal.3d at 388, 211 Cal.Rptr. 758, 696 P.2d 150. Thus, these provisions were intended to advance a legitimate secular purpose. Indeed, this is confirmed by the Supreme Court's decision in *Witters v. Washington Department of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), in which the Court held that a Washington state law that was enacted to "assist visually handicapped persons to ... obtain the maximum degree of self-support and self-care" had an "unmistakably secular purpose," even though a small "amount of the aid awarded under the program [wa]s likely to flow to religious education." *Id.* at 483, 485–86, 106 S.Ct. 748; *see also Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 13–14, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) ( "The IDEA creates a neutral government program dispensing aid not to schools but to individual handicapped children. If a handicapped child chooses to enroll in a sectarian school, we hold that the Establishment Clause does not prevent the school district from furnishing him with a sign-language interpreter there in order to facilitate his education.").

### ii. Primary Effect

 **[18]**    The primary effect of the regulations at issue neither advances nor inhibits religion. "[S]tate programs that are wholly neutral in offering ... assistance to a class defined without reference to religion do not violate the second part of the *Lemon v. Kurtzman* test, because any aid to religion results from the private choices of individual beneficiaries." *Witters,* 474 U.S. at 490–91, 106 S.Ct. 748 (Powell, J., concurring) (*citing Mueller v. Allen,* 463 U.S. 388, 398–99, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983)); *see also Mueller,* 463 U.S. at 398–99, 103 S.Ct. 3062 ("[A] program ... that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause.").

Here, the regulations provide developmentally disabled persons with "the opportunity to attend and participate in ... (1) [w]orship services and activities of the client's choice[;] (2) [c]ommunity service activities[;] (3) [c]ommunity events, including but not limited to concerts, tours, dances, plays, and celebrations of special events[;] (4) [s]elf-help organizations [;] [and] (5) [s]enior citizen groups, sports leagues and service clubs." Cal.Code Regs. tit. 22, § 85079(c). In sum, they offer developmentally disabled persons assistance in attending and participating in a **\*1024** host of "everyday" activities of the client's choice, most of which are secular in nature. Receiving assistance under the regulations is not contingent on a client holding a particular religious belief, or even subscribing to religion in general. Instead, the client is entitled to assistance so long as he or she is defined as disabled under the Lanterman Act. Accordingly, the regulations are "wholly neutral" in offering assistance to developmentally disabled persons without reference to religion.

It is true that some clients may receive assistance in attending religious services, if they wish to attend such services, but "accommodat[ing] and protect[ing] the free exercise of religion, [is something] the Constitution allows." *Mayweathers,* 314 F.3d at 1069 (citing *Corp. of Presiding Bishop,* 483 U.S. at 338, 107 S.Ct. 2862). For example, in *Everson,* the Supreme Court held that the Establishment Clause did not prohibit "New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as part of a general program under which it pays the fares of pupils attending public and other schools." 330 U.S. at 17, 67 S.Ct. 504. The statute was held to be valid even though one of its results was that "some children are helped to get to church schools" and "some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets." *Id.* In ruling the statute valid, the Court observed that the First Amendment

"requires the state to be neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them." *Id.* at 18, 67 S.Ct. 504. We conclude that the regulations at issue here are entirely consistent with these principles.

As a final point of consideration, we note that the primary effect of the regulations at issue is not to inhibit religion insofar as Plaintiffs allege that it requires them to engage in conduct in contravention of their own religious beliefs and practices. As noted above, the regulations do not require Plaintiffs to adopt any particular religious beliefs or to worship, engage in prayer, or otherwise participate in any religious services. Insofar as the regulations require Plaintiffs to merely be present at Jehovah's Witness services, and thus inhibit their own practice of religion because that is something that their religion allegedly prohibits, we cannot say that this is the "primary effect" of the regulations.

### iii. Excessive Entanglement

 **[19]**    In determining whether there is an excessive entanglement with religion, we must analyze "the character and purpose of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationships between the government and the religious activity." *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105. A relationship results in an excessive entanglement with religion if it requires "sustained and detailed" interaction between church and State "for enforcement of statutory or administrative standards." *Id.* at 621, 91 S.Ct. 2105 (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 675, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)); *see also Lynch v. Donnelly,* 465 U.S. 668, 684, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

The regulations at issue do not foster excessive Government entanglement with religion. Looking to the "character and purposes of the institutions that are benefitted," we note that the main beneficiaries of the regulations are developmentally disabled persons, not any institutions, religious or otherwise. Some religious groups are perhaps incidentally benefitted by the regulations insofar as the regulations enable **\*1025**  developmentally disabled members of those groups to attend religious services. However, this incidental benefit does not support a violation of the Establishment Clause.

Looking to the nature of the aid the State provides, we note that State funds are not furnished to religious institutions, but instead to private vendors as payment for services provided to developmentally disabled clients. Finally, the regulations at issue do not require any interaction between the church and State for enforcement of statutory or administrative standards, and thus do not result in an unconstitutional relationship between the Government and religious activity. Accordingly, we cannot say that the regulations foster excessive entanglement with religion.

In sum, because the regulations at issue have a secular legislative purpose, their primary effect is neither to advance nor inhibit religion, and they do not foster excessive government entanglement with religion, the regulations do not violate the Establishment Clause. Because Plaintiffs have also not established that the regulations, and the conduct taken by Defendants consistent with those regulations, violated the Free Exercise Clause, Plaintiffs' first claim is **hereby DISMISSED.**

### *B. Claim 2; Unlawful Retaliation For Plaintiffs' Assertion of Their Right to Freedom of Religion Under the First Amendment*
 **[20]**    In their second claim, Plaintiffs allege that Defendants' conduct "constitutes retaliation in violation of Plaintiffs' rights under the First Amendment." (FAC ¶ 83). To establish a prima facie claim for unlawful retaliation under the First Amendment, Plaintiffs must prove that their conduct was (1) "constitutionally protected," and (2) a "substantial factor" or a "motivating factor" in Defendants' adverse conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Here, Plaintiffs allege that they "engaged in protected activity by asserting their right to freely exercise their religion and avoid accompanying a client to religious services inconsistent with the practices of Plaintiffs' religion." (FAC ¶ 84). They further

allege that "[a]s a direct result of ... this protected activity, Defendants retaliated against Plaintiffs by citing Plaintiff Payne and stopping all client referrals to Plaintiff Payne." (*Id.* ¶ 85).

**[21]**    Assuming Plaintiffs have sufficiently alleged that they engaged in constitutionally-protected activity,[8] they have altogether failed to allege any facts giving rise to a plausible inference that this activity was the motivating factor for any action taken by any of the Defendants. Indeed, beyond the boilerplate assertion that Defendants' conduct was retaliatory, Plaintiffs allege no facts to show that the assertion of their free exercise rights was the impetus for Defendants' decision to cite Payne Care Center or to stop patient referrals. In fact, Plaintiffs' allegations make clear Defendants' decision to cite Payne Care Center was not motivated by Plaintiffs' assertion of their free exercise rights because Plaintiffs themselves allege that the reason "Defendant SG/PRC cited Plaintiffs *[was] for violating their obligations to a client.*" (*Id.* ¶ 49 (emphasis added)). As noted above, the Lanterman **\*1026** Act's regulations provide that a "regional center *shall* apply sanction(s) to a [vendor] when ... a substantial inadequacy is not corrected." Cal.Code Regs. tit. 17, § 56057 (emphasis added). The term "substantial inadequacy" is defined to include "violations of a [client's] rights." *Id.* § 56054(a). In light of the mandatory nature of these regulations, Plaintiffs have failed to raise a plausible inference that Defendants' decision to sanction Plaintiffs was motivated by anything other than their duties under the Lanterman Act. Moreover, Plaintiffs do not allege that these regulations are enforced selectively, making their claim for retaliation yet more implausible.

[8]    Although we conclude, above, that Plaintiffs fail to state a claim under the Establishment or Free Exercise Clause, we assume—for purposes of analysis of Plaintiffs' retaliation claim only—that Plaintiffs' mere assertion of their free exercise rights constitutes protected activity.

**[22]**    Additionally, we recognize that a plaintiff pursuing a First Amendment retaliation claim may, where appropriate, rely upon a chronology of events from which retaliation may be plausibly inferred. *Pratt v. Rowland,* 65 F.3d 802, 808 (9th Cir.1995). But here, the mere fact that Plaintiffs were cited after they asserted their free exercise rights does not raise a plausible inference of retaliation in light of the mandatory nature of the regulations cited above. Further, the fact that Defendants "notified Plaintiffs that C.W. must be given the opportunity to attend the Jehovah's Witness services," (FAC ¶ 43), before Plaintiffs asserted their free exercise rights further supports the opposite inference that Plaintiffs' assertion of their rights *was not* the impetus for Defendants' conduct. Indeed, this fact shows that Defendants maintained the same position with respect to Plaintiffs' obligations both before and after they asserted their free exercise rights.

In sum, Plaintiffs' boilerplate allegation that the assertion of their free exercise rights was a substantial or motivating factor in Defendants' decision to issue the citation or stop patient referrals does not rise "above the speculative level." *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *accord Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1952, 173 L.Ed.2d 868 ("[Plaintiff] would need to allege more by way of factual content to 'nudg[e]' his claim of purposeful discrimination 'across the line from conceivable to plausible.' " (alteration in original) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955)). Accordingly, Plaintiffs have failed to state a plausible claim for unlawful retaliation under the First Amendment.

### C. Plaintiffs' Purported Title VII Claim

As noted above, in their Opposition to SGP Defendants' Motion, Plaintiffs argue that they "[h]ave plead [sic] sufficient facts to establish a claim for violations of Title VII of the Civil Rights Act." (Dkt. No. 51, at 27). However, Plaintiffs have not asserted a Title VII claim anywhere in the FAC. The only reference to Title VII in the FAC is provided in Plaintiffs' allegation that in a meeting Payne Care Center "expressed its concern with Defendant SGP Regional Center's directive that Payne Care Center employees accompany C.W. to religious services, particularly because of Plaintiff Payne's potential exposure to liability under Title VII of the Civil Rights Act if it forced its employees, including Plaintiffs Robin Fleming, Lavonia Williams, and Robert Williams, II, to attend religious services with C.W." (FAC ¶ 45).

Title VII makes it unlawful for an employer to fail to make reasonable accommodations for the religious practices of its employees and to discriminate against its employees on the basis of religion. 42 U.S.C. §§ 2000e(j), 2000e–2(a)(1).

**\*1027** [23]  Here, Plaintiffs have failed to allege that they were "employees" [9] of any of the Defendants such that they could state a claim against Defendants under Title VII. *See Adcock v. Chrysler Corp.,* 166 F.3d 1290, 1292 (9th Cir.1999) ("[T]here must be some connection with an employment relationship for Title VII protections to apply." (quoting *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir.1980))). Moreover, even if Plaintiffs could state a claim against Defendants under Title VII, they have failed to allege that they exhausted their administrative remedies with respect to any such claim. *See Sommatino v. United States,* 255 F.3d 704, 707 (9th Cir.2001) ("In order to bring a Title VII claim in district court, a plaintiff must first exhaust her administrative remedies."). Accordingly, Plaintiffs have not pled sufficient facts to establish a claim for violation of Title VII against Defendants and it is entirely unclear how Plaintiffs could assert such a claim if they were granted leave to amend. To the extent Plaintiffs attempt to assert a claim against Defendants based upon the fact that Defendants' actions have somehow subjected *Plaintiffs* Payne Care Center and Kingsley Home Care to liability under Title VII, such a claim would not lie under Title VII itself. Because we previously granted Plaintiffs leave to amend their Complaint to assert a claim based upon their Title VII allegations, and they failed to do so, we decline to grant further leave to amend.

[9]  "The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year...." *Id.* § 2000e(b). "The term 'employee' means an individual employed by an employer...." *Id.* § 2000e(f).

### D. Leave to Amend

[24]  [25]  In the event of dismissal, Plaintiffs have requested leave to amend the FAC. (Opp'n, Dkt. No. 51, at 29). A district court may grant leave to amend when dismissing a case for failure to state a claim, "unless [the court] determines that the pleading could not possibly be cured by the allegations of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (quoting *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995)). As explained above, we previously granted Plaintiffs leave to amend their initial Complaint after we granted Employee Defendants' initial motion to dismiss. In doing so, we warned Plaintiffs that the theories they had presented were "unclear." Nonetheless, Plaintiffs chose to repeat those theories, mostly verbatim, in their FAC and in opposition to Defendants' motions to dismiss the FAC. The fact that Plaintiffs have already had two chances [10] to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile. Accordingly, Plaintiff's request for further leave to amend is **DENIED.**

[10]  Plaintiffs had the opportunity to defend the sufficiency of their claims under the First Amendment (1) in their supplemental opposition to Employee Defendants' motion to dismiss the initial Complaint, and (2) in opposition to the present Motions.

### V. Conclusion

In light of the foregoing, we conclude that Plaintiffs have failed to state a claim for (1) deprivation of the right to freedom of religion under the First Amendment, and (2) unlawful retaliation for Plaintiffs' assertion of their right to freedom of religion under the First Amendment. Accordingly, Defendants' Motions are **GRANTED** and the FAC is hereby **DISMISSED** without further leave to amend.

**IT IS SO ORDERED.**

## \*1028  JUDGMENT

Pursuant to the Court's October 19, 2011, and March 23, 2012 Orders, IT IS HEREBY ADJUDGED that Plaintiffs Robert Williams, Sr.; Robin Fleming; Robert Williams, II; Lavonia Williams; Payne Care Center; and Kingsley Home Care's (collectively, "Plaintiffs") claims against Defendants State of California; San Gabriel Pomona Regional Center; Claire Matsushita, in her individual and official capacity; R. Keith Penman, in his individual and official capacity; Claudia Hemingway, in her individual and official capacity; Adriane Picazo, in her individual and official capacity; and Lucina Galarza, in her individual and official capacity, are **DISMISSED with prejudice.** Plaintiffs shall take nothing by this Complaint,

**IT IS SO ORDERED.**

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.