Filed 5/30/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| A.L., an Incompetent Person, etc.,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>HARBOR DEVELOPMENTAL DISABILITIES FOUNDATION,<br><br>     Defendant and Respondent. | B322729<br><br>(Los Angeles County Super. Ct. No. 19STCV05630) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Greene Broillet & Wheeler, Scott H. Carr, Ivan Puchalt; Law Offices of Jacob Emrani, Jacob Emrani; Esner, Chang, Boyer & Murphy, Holly N. Boyer and Shea S. Murphy for Plaintiff and Appellant.

Horvitz & Levy, Andrea M. Gauthier, Scott P. Dixler; Beach Law Group, Thomas E. Beach, Darryl C. Hottinger and Eligio J. Luevanos for Defendant and Respondent.

\* \* \* \* \* \*

Through the Lanterman Developmental Disabilities Services Act (the Lanterman Act or the Act) (Welf. & Inst. Code, § 4500 et seq.),[1] the State of California has undertaken the duty to provide developmentally disabled persons with appropriately tailored services and support.  The Act relies upon a network of private, nonprofit entities called "regional centers" (§ 4620), whose job it is—not to *provide* the services and support—but instead to assess which services and support each developmentally disabled person (whom the Act calls a "consumer") needs, to contract with direct service providers (whom the Act calls "vendors") to provide those services and support, and to thereafter engage in "limited monitoring" of those contracts (§§ 4642, 4643, 4640.6, subd. (a), 4647, 4648, 4648.1, 4742, 4743; *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 490 (*Morohoshi*)).  In this case, a female consumer was raped by the employee of a transportation vendor while being transported to an education program.  The consumer sued the employee, the vendor, and the regional center.  Her lawsuit presents the following question:  Does a *regional center* have a duty to protect a consumer against sexual assault by a vendor's employees premised on the center's failure to sufficiently monitor the vendor and its employees?  We conclude that the answer is "no" except

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

when a regional center has actual knowledge of the vendor employee's propensity to engage in such conduct. Because it is undisputed here that the regional center had no such knowledge, the duty to protect was not triggered in this case, and we accordingly affirm the trial court's grant of summary judgment for the regional center.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The regional center and its transportation vendor*

Harbor Developmental Disabilities Foundation (the Regional Center) is a nonprofit entity that has functioned as a regional center under the Act for over three decades.

Round Trip Transportation, Inc. (Round Trip), is a private company that transports developmentally disabled persons between their homes and the services they need. In 2018, Round Trip's four central office employees oversaw 70 or 80 drivers who drove its fleet of GPS-tracked buses, each of which could accommodate 15 passengers and transported 700 to 800 consumers of various regional centers each day. Round Trip hired Ezequiel Ocampo (Ocampo) as a driver in 2013; Round Trip ran a criminal background check on Ocampo when he was initially hired and every year thereafter; all came back clean.

In July 2015, the Regional Center entered into a three-year contract with Round Trip to provide transportation services for its consumers. The contract designated Round Trip as an "independent contractor," but obligated Round Trip to "employ, train and retain the required number of drivers, aides, dispatchers and administrative personnel necessary to provide the required levels of service," to screen and conduct background

3

checks on its employees, to conduct annual reviews of its drivers' performance, and to provide a minimum of 40 hours of training to its employees, including on the topics of the "signs of abuse and neglect," "the process for reporting [such abuse and neglect]," and "the consequences of failing to follow the law." Under the contract, the Regional Center reserved the right to monitor Round Trip's "service delivery" on a "periodic basis" (by observing its buses and going on ride-alongs) as well as the right to inspect the service logs and related records the contract obligated Round Trip to maintain. The contract also specified that Round Trip was in default if any consumer was "subject[ed] to physical or psychological abuse" by any of its employees. This contract adhered to the state regulations specifying the content of vendor contracts under the Act. (Cal. Code Regs., tit. 17, § 58524, subd. (c).)

A Regional Center employee inspected Round Trip's operations when Round Trip "first came on as a provider," including going on a ride-along. The Regional Center thereafter held trainings for the employees of Round Trip (and other vendors) on "disability awareness" and how to report any incidents. The Regional Center maintained monthly contact with Round Trip, but did not conduct any further in-person inspections. Instead, the Regional Center's monitoring was "reactive" insofar as it would respond to "complaints" from the consumers' caregivers. Between June 2015 and August 2018, the Regional Center received dozens of complaints regarding Round Trip: Nearly all dealt with late pick-ups or drop-offs or other

4

issues related to the transportation itself; there were no complaints of inappropriate touching by Round Trip's employees.[2]

The Regional Center entered into a one-year extension of its contract with Round Trip in June 2018.

### B. *The consumer*

In 2018, A.L. was an adult living with mental and physical disabilities she had since birth. A.L. has been a consumer of the Regional Center since she was an infant. In 2018, she was living with her mother but attending an educational day program at Easter Seals every weekday; she was transported to and from the program by Round Trip.

### C. *The rape*

In May or June 2018, Ocampo raped and impregnated A.L. while transporting her. Ocampo pled no contest to the felony of raping an incompetent person (Pen. Code, § 261, subd. (a)(1)), and was sentenced to six years in state prison.

It is undisputed that the Regional Center had no actual knowledge of Ocampo's proclivities to engage in such conduct. Following his conviction, Ocampo denied ever receiving formal

---

[2] Five of the complaints during that period dealt with consumers causing physical injury to one another or to themselves, and one dealt with a driver pulling back the waistband of a consumer's pants to show an education program vendor that the consumer had defecated in his pants when the program vendor refused to believe the driver. After the incident at issue in this case, the Regional Center received a February 2020 complaint that a consumer required three stitches after a Round Trip bus driver observed an abrasion on his head and a March 2020 complaint from a woman who said she had heard from one of her friends that the friend's relative had been groped by a Round Trip bus driver.

training telling him not to engage in the sexual abuse of consumers, and denied understanding nearly anything in the written paperwork provided to him by Round Trip and anything taught at any training because he mostly understood only Spanish, although Ocampo admitted that he was told to "be careful to avoid . . . situations" of sexual abuse and not to hug passengers, and Ocampo's employment forms indicated that he did receive Round Trip's employee handbook and company policies.

After the rape was reported, the Regional Center thereafter conducted an extensive investigation of the incident and Round Trip. In a November 2018 report, the Regional Center concluded that Round Trip did not have a "formal system" of logging complaints, that it had an inadequate tracking system for monitoring irregularities with drivers and the quality of its services, that it needed a formal system for notifying consumers' caregivers of changes in scheduling, that it needed more staff in its central office, and that it needed to ensure its employees were trained on client abuse and neglect upon hiring and annually thereafter.

## II. Procedural Background

### A. *Operative pleading*

In February 2019, A.L., through her mother acting as her guardian ad litem, sued Round Trip and Ocampo. In the operative second amended complaint, A.L. also sued the Regional Center for negligence.[3] The complaint alleged that the Regional

---

[3] In the operative complaint, A.L. also sued Round Trip and Ocampo for (1) battery, (2) negligence, (3) violations of the Tom Bane Civil Rights Act (Civ. Code, §§ 52.1, 52), and (4) violations of the Ralph Civil Rights Act of 1976 (*id.*, § 51.7).

6

Center (1) negligently hired Round Trip as a vendor without doing a proper investigation; and (2) negligently monitored Round Trip's compliance with its vendor contract because the Regional Center did not discover, until after the rape, that Round Trip's operations had the shortcomings identified in the November 2018 report. The complaint further alleged that this inaction "direct[ly] and proximate[ly]" caused the rape.

### B. *Summary judgment*

In February 2021, the Regional Center filed a motion for summary judgment on the ground that it owed A.L. no duty to prevent sexual assault by a vendor's employee.[4] After a full round of briefing and a hearing, the trial court granted the motion.

### C. *Motion for new trial*

A.L. thereafter filed a motion for new trial asking the trial court to reconsider its grant of summary judgment in light of our Supreme Court's decision in *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204 (*Brown*). After a full round of briefing and a hearing, the trial court denied the motion for new trial and allowed the summary judgment to stand.[5] The court reasoned that it had "real doubt" whether the Regional Center had a "special relationship" with A.L., and further reasoned that public policy considerations militated against recognizing a duty to protect, at

---

[4] By this time, the trial court had overruled a demurrer on the same ground.

[5] The trial court had initially granted summary judgment for Round Trip, but granted plaintiff's motion for a new trial as to that judgment.

7

least where a regional center "has no way of knowing that [a vendor's] employee . . . is likely to [sexually] abuse a [consumer]."

**D.** *Appeal*

A.L. filed this timely appeal.

## DISCUSSION

A.L. argues that the trial court erred in granting summary judgment.

"Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.'" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); see Code Civ. Proc., § 437c, subd. (c).) To prevail on such a motion, the moving party—here, the Regional Center—must show that the plaintiff "has not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question." (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 500; Code Civ. Proc., § 437c, subd. (o)(1).) In evaluating whether the Regional Center made this showing, we liberally construe the evidence before the trial court in support of the party opposing summary judgment—here, A.L.— and resolve all doubts concerning the evidence in support of that party. (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.) We independently review the grant of summary judgment as well as any subsidiary legal questions, such as whether a duty of care or special relationship exists. (*California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1087 [summary judgment]; *Brown, supra,* 11 Cal.5th at p. 213 [duty of care]; *Regents*, at p. 620 [special relationship].) Because our review is de novo, we are concerned with the correctness of the trial court's result, not its reasoning. (*Burgueno v. Regents of University of*

8

*California* (2015) 243 Cal.App.4th 1052, 1075; *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.)[6]

## I. The Lanterman Act

"Pursuant to the Lanterman Act, our state has undertaken the duty to provide '[a]n array of services and supports' to 'person[s] with developmental disabilities.' (§ 4501; see also § 4512, subd. (a)(1) [defining 'developmental disability']; *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 388-389.) The Act labels those persons 'consumers.' (E.g., see § 4640.7 et seq.; Cal. Code Regs., tit. 17, § 56002, subd. (a)(5).) [¶] The [State] Department [of Developmental Services] oversees the provision of services and support to those consumers. (§ 4416.) However, because those services and support 'cannot be satisfactorily provided by state agencies,' the Act requires the [State] Department [of Developmental Services] to do so by contracting with 'regional centers,' which are 'private nonprofit community agencies' that operate as 'fixed points of contact in the community' to diagnose, counsel and coordinate the acquisition of the necessary services and support. (§§ 4620, 4640.7, subd. (a); see §§ 4501, 4621, 4640.6, subd. (a); Cal. Code Regs., tit. 17, § 56002, subd. (a)(36); *Morohoshi*[, *supra*], 34 Cal.4th [at pp.] 486-488; *In re Williams* (2014) 228 Cal.App.4th 989, 996, fn. 2.)" (*Shalghoun v. North Los Angeles County Regional Center, Inc.* (2024) 99 Cal.App.5th 929, 941 (*Shalghoun*).)

---

[6] As a result, we will not address the parties' arguments regarding alleged errors in the trial court's reasoning.

More specifically, regional centers are tasked with the following:

- *Diagnosis and program development.* Once a regional center evaluates a consumer and determines that they suffer from a "developmental disability," the center must assess their needs and formulate an "individual program plan" that delineates, as pertinent here, the needed "services and supports." (§§ 4642, subd. (a), 4643, subd. (b), 4646, 4512, subd. (a), 4646.5, subd. (a); *Morohoshi, supra,* 34 Cal.4th at pp. 487-488; Cal. Code Regs., tit. 17, § 56022, subd. (b).)

- *Coordinating the provision of services and support.* It is not the job of regional centers to directly provide any services or support; instead, their job is to *coordinate* the services and support a consumer's needs by contracting with "direct service providers," who are also called vendors. (§§ 4648, 4640.6, subd. (a); *Morohoshi, supra,* 34 Cal.4th at pp. 488, 489 ["the responsibility of a regional center is to 'secure,' not provide, care"].) The array of possible services and support is comprehensive and vast;[7] among the 48 different types of services

_____

[7] Those services and support include, but are not limited, to "diagnosis, evaluation, treatment, personal care, daycare, domiciliary care, special living arrangements, physical, occupational, and speech therapy, training, education, supported and sheltered employment, mental health services, recreation, counseling of the [consumer] and of the [consumer's] family, protective and other social and sociolegal services, information and referral services, follow-along services, adaptive equipment and supplies, advocacy assistance, including self-advocacy training, facilitation and peer advocates, assessment, assistance in locating a home, childcare, behavior training and behavior modification programs, camping, community integration services, community support, daily living skills training, emergency and

10

and support are "transportation services necessary to ensure delivery of services to" consumers.  (§ 4512, subd. (b).)  Vendors may include the consumer's relatives.  (E.g., Cal. Code Regs., tit. 17, § 54327, subd. (a).)

● *Monitoring the provision of services and support.* Regional centers are tasked with monitoring whether the services and support provided by the vendors are in accord with (1) the consumer's individual program plan (§§ 4742, 4743; Cal. Code Regs., tit. 17, § 56047, subd. (a)), and (2) the terms of the vendor contract and applicable state law and regulations (e.g., *Williams v. California* (C.D.Cal. 2012) 990 F.Supp.2d 1009, 1014).  Given the vast number of consumers they serve and the vast number of services and support coordinated for each consumer, "regional centers are not intended to monitor the care provided by [vendors] on [a] day-by-day" or "hour-by-hour" basis; instead, their "monitoring responsibilities," while "important," are necessarily "limited."  (*Morohoshi*, *supra*, 34 Cal.4th at pp. 488-489, 490.)

II.     **Analysis of Tort Law**

A.L.'s sole claim against the Regional Center is grounded in negligence.  To prevail on a negligence claim, a plaintiff must

---

crisis intervention, facilitating circles of support, habilitation, homemaker services, infant stimulation programs, paid roommates, paid neighbors, respite, short-term out-of-home care, social skills training, specialized medical and dental care, telehealth services and supports, . . . supported living arrangements, technical and financial assistance, travel training, training for parents of [consumers], training for [consumers who are] parents . . . , vouchers, *and transportation services necessary to ensure delivery of services to [consumers]*."  (§ 4512, subd. (b), italics added.)

11

establish, as a "threshold matter," that she is owed a "legal duty of care." (*Brown*, *supra*, 11 Cal.5th at pp. 213, 209.) Whether a defendant owes a plaintiff a legal duty of care actionable in negligence is, ultimately, a "question of public policy." (*Regents*, *supra*, 4 Cal.5th at pp. 627-628; see *Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1016 (*Kuciemba*); *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*).) In *Brown*, our Supreme Court clarified that this question of public policy is really *two* questions—namely, "(1) Does the defendant owe the plaintiff a legal duty of care under traditional principles of tort law, and if so, (2) do the relevant public policy considerations set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) nevertheless favor 'limiting that duty'?" (*Shalghoun*, *supra*, 99 Cal.App.5th at p. 944; *Brown*, at p. 209.)

In the operative complaint, A.L. alleges that the Regional Center owed her a duty to prevent Ocampo's rape and that it breached that duty by its initial failure to properly vet Round Trip as a vendor and its subsequent failure to adequately monitor Round Trip's provision of transportation services. These allegations frame our inquiry into the legal duty of care. (*California-American Water Co. v. Marina Coast Water Dist.* (2022) 86 Cal.App.5th 1272, 1306; *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 830.)

### A. *Duty under traditional principles of tort law*

Under the traditional principles of tort law, a person generally has no legal duty to protect others from a third party's conduct; consequently, that person's *inaction* (or nonfeasance) does not give rise to tort liability. (*Regents*, *supra*, 4 Cal.5th at pp. 619, 627; *Williams v. State of California* (1983) 34 Cal.3d 18, 23; *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 49.)

12

But this general, no-duty-to-protect rule has an exception pertinent to this case: If the party who is sued (the defendant) has a "special relationship" with the party who is injured (the plaintiff), that relationship may give rise to a duty to protect the plaintiff from the harm inflicted by third parties if the defendant has "superior control over the means of protect[ing]" the plaintiff and the plaintiff concomitantly "depend[s]" upon that protection. (*Regents, supra*, 4 Cal.5th at pp. 619-621; *Shalghoun, supra*, 99 Cal.App.5th at pp. 446, 494.)

Because regional centers are tasked with coordinating vendors to provide consumers services and support as well as engaging in "limited" monitoring to ensure compliance with the consumer's plan and the vendor's contracts, and because these statutorily imposed tasks ostensibly give regional centers at least some measure of control over the means of protecting the consumers, we conclude that regional centers have a special relationship with their consumers that gives rise to a duty to protect consumers from sexual abuse.[8] (Accord, *Shalghoun, supra*, 99 Cal.App.5th at p. 951 ["assum[ing]" "a duty to protect" that "runs" from regional centers "*to the consumer[s]*"].)

**B.** ***Public policy considerations that may counsel in favor of limiting the duty***

Notwithstanding our conclusion that traditional principles of tort law provide that regional centers have a duty to protect

___

[8] The conclusion is the same even if we view a regional center's coordination of services and support as *misfeasance*, for an affirmative act that places a consumer in "peril" also gives rise to a duty to protect. (*Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 424-425; *McHenry v. Asylum Entertainment Delaware, LLC* (2020) 46 Cal.App.5th 469, 485.)

13

consumers from sexual abuse, "courts have the power and obligation to examine whether considerations of public policy warrant limiting that duty." (*Shalghoun*, *supra*, 99 Cal.App.5th at p. 946; *Brown*, *supra*, 11 Cal.5th at p. 217; *Regents*, *supra*, 4 Cal.5th at pp. 628-629.) "This public policy analysis is 'forward-looking' and to be conducted on a general, categorical basis (*Kesner*, *supra*, 1 Cal.5th at p. 1152; see *Kuciemba*, *supra*, 14 Cal.5th at p. 1022); in effect, we ask: Does public policy warrant curtailing liability in a particular *category* of cases in the future?" (*Shalghoun*, at p. 946.)

1. *The* Rowland *factors*

In *Rowland*, our Supreme Court outlined the pertinent public policy considerations. They fall into two categories.

The first category examines the foreseeability of the plaintiff's injury. *Rowland* identifies three foreseeability factors: (1) whether "'"the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed"'"; (2) the degree of certainty that the plaintiff suffered injury; and (3) the closeness of the connection "'between the defendant's conduct and the injury suffered.'" (*Regents*, *supra*, 4 Cal.5th at pp. 629-630.)

Although these foreseeability factors are "'[t]he most important'" (*Regents*, *supra*, 4 Cal.5th at p. 629), foreseeability is not dispositive of the policy analysis and may be outweighed by the second category of *Rowland* factors (*Kesner*, *supra*, 1 Cal.5th at p. 1149). Those factors ask whether "'the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.'" (*Kesner*, at p. 1150.) In other words, they ask whether recognizing the duty

14

"would deter socially beneficial behavior." (*Kuciemba, supra,* 14 Cal.5th at p. 1028.) *Rowland* identifies four of these countervailing policy considerations: (1) the moral blame attaching to the defendant's conduct (*Kuciemba,* at p. 1025); (2) whether liability will "'prevent[] future harm,'" which looks to "both the positive and the negative societal consequences of recognizing a tort duty" "in terms of how the imposition of liability is likely to play out" (*id.* at pp. 1021-1022, 1026; *Shalghoun, supra,* 99 Cal.App.5th at p. 947; see *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1217); (3) the "'extent of the burden to the defendant and consequences to the community of imposing a duty . . . with resulting liability for breach'" (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 398), including whether recognizing tort liability "would impose enormous and unprecedented financial burdens" on likely defendants (*Kuciemba,* at pp. 1027, 1021-1022); and (4) the availability of insurance (*id.* at pp. 1021-1022).

  2. *Applying the* Rowland *factors to the duty to protect based on a failure to vet and monitor a vendor*

With the *Rowland* factors and the operative complaint in mind, the question then becomes:  Does the duty owed by regional centers to protect consumers from sexual assault—premised upon their statutory duties to coordinate services and support provided by vendors and thereafter to monitor compliance with those vendors' contracts—render the regional centers liable in tort to consumers for sexual assaults committed by any vendors' employees, or do public policy considerations warrant some limitation of that duty?

*Rowland's* foreseeability considerations counsel in favor of limiting this duty to protect.  Even if we assume that all

15

developmentally disabled persons are vulnerable and it is therefore more likely that they may be sexually assaulted (the first factor),[9] and if we acknowledge the absolute certainty that developmentally disabled persons are injured if they are sexually assaulted (the second factor), the connection between a regional center's failure to sufficiently vet and sufficiently monitor vendors on the one hand, and the sexual assault of consumers by an employee of a vendor on the other, is not close. Regional centers do *not* employ the vendors' employees; the *vendors* do. (Cf. *Roman Catholic Archbishop*, *supra*, 70 Cal.App.5th at pp. 672-673 [church employed priests who molested children]; *Lawndale*, *supra*, 72 Cal.App.5th at p. 132 [school employed janitor who molested children]; *Youth Soccer*, *supra*, 8 Cal.App.5th at pp. 1138-1139 [soccer organization specified how volunteers would be trained and supervised].) Regional centers

---

9　Although inadequate oversight of individuals entrusted with *children* has generally been viewed as sufficiently likely to result in the sexual abuse of children (e.g., *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 664-665, 676 (*Roman Catholic Archbishop*); *Doe v. Lawndale Elementary School Dist.* (2021) 72 Cal.App.5th 113, 132 (*Lawndale*); *Doe v. United States Youth Soccer Assn., Inc.* (2017) 8 Cal.App.5th 1118, 1135 (*Youth Soccer*); *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 398, 404, overruled on other grounds by *Brown*, *supra*, 11 Cal.5th 204), and although developmentally disabled *adults* may be to some extent analogous to children in terms of being more vulnerable to abuse than adults without such disabilities, developmentally disabled adults possess a broad range of cognitive abilities, and the record in this case contains no evidence supporting the proposition that developmentally disabled adults as a population are as likely as children to be sexually assaulted while in the care of others.

16

do *not* own or control the vendors' premises; the *vendors* do. (*Colonial Van & Storage, Inc. v. Superior Court* (2022) 76 Cal.App.5th 487, 498 ["California courts have declined to impose a duty to protect for tortious or criminal harm committed by third parties on property that defendants . . . did not actually own, possess, or control"]; cf. *Roman Catholic Archbishop*, at pp. 672-673 [molestation occurred on church property]; *Lawndale*, at p. 135 [molestation occurred on school property]; *Jane IL Doe v. Brightstar Residential Inc.* (2022) 76 Cal.App.5th 171, 173-183 [molestation occurred on employer's property]; *M.W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 519-520 [sexual assault of a "mentally retarded student" by a "troubled" student occurred on school grounds].) This is no doubt why A.L. frankly acknowledges that regional centers are "once removed." The limited access and control regional centers have over the vendors with whom they contract—a relationship that is governed by statute and regulation—make it unlikely that additional vetting and monitoring would uncover the predilections of a vendor's employee to engage in sexual assault. Thus, the connection between shortcomings in vetting and monitoring of a vendor and a subsequent sexual assault by one of the vendor's employees is weak. (Accord, *Doe v. L.A. County Dept. of Family Services* (2019) 37 Cal.App.5th 675, 684-685 (*Doe*) [absence of additional vetting and oversight "would not have led to information about the [employee's] criminal propensities"].)

*Rowland's* countervailing policy considerations all but dictate that we limit the duty to protect running from regional centers to consumers here.

Where the regional center's alleged shortcoming is the failure to adequately vet and monitor vendors' compliance with

17

consumers' plans and the vendors' contracts, the moral blame for a subsequent sexual assault by a vendor's employee does not lie with the regional center. If, as our Supreme Court has noted, "little or no moral blame attache[s]" to an employer's "hiring or retention decision" unless that employer "knew or should have known of the dangerous propensities of the employee who injured the plaintiff" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 878), then there is even less moral blame attaching to a regional center who is "once removed" from that hiring decision. Further, because moral blame is "typically found when the defendant reaps a financial benefit from the risks it has created" (*Kuciemba, supra*, 14 Cal.5th at p. 1025), the absence of any financial motive by regional centers means they are less morally blameworthy for this reason as well.

Imposing liability on regional centers for sexual assaults committed by vendors' employees due to the regional centers' inadequate vetting and monitoring will also not prevent such assaults because even adequate vetting and monitoring is unlikely to uncover the criminal propensities of those employees and because regional centers do not control those employees or the vendors' premises where the employees work. More to the point, recognizing a duty by regional centers to prevent sexual assault by any vendors' employees by virtue of insufficient vetting and monitoring would convert regional centers into the de facto insurers against all sexual assaults inflicted by any vendor employee against any consumer.[10] (Accord, *Regents, supra*, 4

---

**10** Indeed, because a consumer's family members can also be vendors (Cal. Code Regs., tit. 17, § 54326, subd. (a)), this would render a regional center liable for sexual assault committed by a consumer's family members.

Cal.5th at p. 634 [expressing hesitation when the imposition of liability will convert a class of defendants into "the ultimate insurers of all . . . safety"]; *Shalghoun*, *supra*, 99 Cal.App.5th at pp. 952-953 [declining to impose duty on regional centers to protect residential facility vendor employees from injury caused by consumers when the regional center did not move a consumer as requested by the facility because doing so would convert regional centers into de facto insurers against all such injuries].) Because the Act precludes regional centers from providing services themselves, and contrary to A.L.'s bald assertion that only "minimal effort" would be "necessary to supervise and monitor" vendors, the only way for regional centers to mitigate that liability would be to engage in very close oversight of all vendor employees.[11] But that would be an impossible task given

---

[11] The facts of this case are a vivid example. The Regional Center *did* provide training to Round Trip's employees on consumer abuse and neglect on one occasion, and contractually obligated Round Trip to provide it to any of its employees who did not attend that training. The Regional Center also obligated Round Trip's employees to receive a copy of its policies regarding protecting consumers, and Round Trip's records indicate that it gave a copy of that policy to Ocampo. Ocampo later said he did not attend any training; he also said he lied about receiving a copy of the policy and never understood it due to the policy not being in his native language. The only way for the Regional Center to be sure that every vendor employee is trained would be to interview them individually to ensure both their receipt and their comprehension of its anti-abuse policies. Given the sheer number of employees employed by the dozens if not hundreds of vendors in the 48 different categories of services that regional centers provide, this burden of ensuring merely that every vendor employee *understood* the anti-abuse policy is anything but "minimal."

19

the sheer number of employees working for the vendors who directly provide the 48 categories of services and support specified in the Act. That would leave regional centers liable in tort for all sexual assaults committed by all vendors' employees. Yet "[i]mposing such vast tort liability on regional centers that are, by definition, nonprofit entities, will likely drive them out of business and hence end up doing *nothing* to prevent future harm." (*Shalghoun*, at p. 953.) A.L. argued for the first time at oral argument that our Legislature's decision to assign the responsibilities of evaluating, coordinating, and monitoring to *private* nonprofit regional centers rather than to some public agency amounts to an expression of legislative intent that regional centers not enjoy tort immunity. This argument not only ignores that the immunity enjoyed by public agencies is limited and does not extend to the negligent failure to protect against risks (Gov. Code, § 815.6) or to the negligent acts of their employees (*id.*, § 820), but also ignores that our Legislature resorted to private nonprofit entities because it did not view state agencies as viable entities (*Shalghoun*, at p. 941).

Imposing liability on regional centers for sexual assaults committed by vendors' employees due to the regional centers' inadequate vetting and monitoring of vendors would impose a crushing burden on those centers, would drive them out of business, and thus would very like render the Lanterman Act a dead letter because no regional center would remain in business to coordinate and contract for the services and support needed by developmentally disabled individuals across the state. (*Shalghoun*, *supra*, 99 Cal.App.5th at p. 953.) Even if imposing tort liability does not destroy all regional centers, the imposition of that liability is likely to shift their focus away from providing

20

services and support for consumers and toward extensive oversight of vendors that is still unlikely to uncover the criminal propensities of employees.

It is not clear whether the imposition of tort liability in this context might be mitigated by the availability of insurance because it is "far from clear that insurers would insure regional centers for the type of open-ended liability that may accrue here when such centers lack the ability to" mitigate that liability because they do not control the vendors' employees, because they do not control the vendors' premises, and because additional vetting and supervision are unlikely to reveal individual employees' propensities to sexually assault consumers. (*Shalghoun, supra*, 99 Cal.App.5th at p. 954.) Although a regulation empowers regional centers to require vendors to obtain "liability insurance" (Cal. Code Regs., tit. 17, § 58510, subd. (c)(1)), that regulation does not explicitly empower regional centers to require vendors to list the regional center as an additional insured and, therefore, the Legislature did not set up a liability-protection measure for regional centers specifically. More broadly, the fact that it may or may not be possible to protect against a liability does not by itself justify the creation of a duty giving rise to such a liability.[12]

---

[12] For much the same reason, we reject A.L.'s argument—raised for the first time at oral argument—that the likelihood that a jury might apportion more fault to a vendor than to a regional center counsels in favor of imposing liability against the regional center. There is no guarantee juries would do that; more to the point, the possibility that regional centers might be deemed to be less liable than vendors is not an argument for imposing liability on regional centers in the first place.

Holding regional centers liable for sexual assaults committed by vendors' employees on the basis of the centers' failure to sufficiently vet and monitor the vendors is also inconsistent with our Supreme Court's decision in *Morohoshi, supra*, 34 Cal.4th 482.  Because a consumer is likely to be sexually assaulted by a vendor's employee only if both the regional center *and the vendor* have not detected the employee's propensity to engage in such acts, holding the regional center liable in this circumstance is in many respects akin to holding the regional center vicariously liable for the vendor's negligence.  But *Morohoshi* held that regional centers are not vicariously liable for a vendor's negligence, even when, in that case, it causes the death of a consumer.  (*Id.* at p. 486.)  It is difficult to square a rule of tort liability effectively holding a regional center vicariously liable for a consumer's sexual assault when *Morohoshi* precludes vicarious liability for a consumer's death.

This analysis of the *Rowland* factors warrants *limiting* the duty to protect.  However, as discussed next, it does not justify eliminating it entirely.

3.    *Applying the* Rowland *factors to the duty to protect premised on a failure to take action when the regional center has actual knowledge of the vendor employee's proclivities*

Although the *Rowland* factors warrant the conclusion that regional centers do not owe a duty to protect consumers from sexual assault by vendors' employees premised solely on the center's failure to adequately vet and monitor vendors, we conclude that there is such a duty when a regional center fails to

act despite its actual knowledge of a particular vendor employee's propensity for sexual assault.[13]

We reach this conclusion for four reasons.

First, limiting a regional center's duty to protect against sexual assault of a consumer by a vendor employee to instances in which the regional center has actual knowledge of the employee's proclivity for such assaults is supported by the *Rowland* factors themselves. When a regional center actually knows that the employee of a vendor has a predilection to engage in sexual assault, any resulting sexual assault committed against a consumer by that employee is far more foreseeable, and the connection between the regional center's inaction and the resulting sexual assault is far closer. And in this context, a regional center's inaction is more morally blameworthy, imposing liability will be more likely to encourage intervention by the regional center, and this tort liability is unlikely to be overwhelming or detrimental to the continued operation of the Lanterman Act because the instances in which a regional center will be actually aware that a vendor's employee has such a predilection and will take no action are likely to be far fewer in number.

---

[13] Because state law requires vendors to conduct criminal background checks on their employees, and because A.L.'s operative complaint does not seek to impose liability due to the failure to conduct such checks, we have no occasion to examine whether a regional center would have any liability for failing to ensure that such checks are conducted by a vendor. (Cf. *Youth Soccer, supra*, 8 Cal.App.5th at p. 1129 [imposing liability on youth soccer organization for failing to require background checks].)

Second, limiting a regional center's duty to protect against sexual assault of a consumer by a vendor's employee to instances in which the regional center has actual knowledge of the employee's proclivity for such assaults is supported by precedent. In *J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388 (*J.L.*), a child molested by the relative of an owner of a low-income daycare facility sued the nonprofit corporation that referred the child to that daycare facility. The court held that the nonprofit corporation had a "special relationship" with the child, but held that a referring entity's duty to protect a child from sexual assault only arises when that entity has actual knowledge of the molester's propensity for sexual assault; the entity's alleged failure to investigate further was not enough to create a duty. (*Id.* at pp. 396-397.) The court in *Doe*, *supra*, 37 Cal.App.5th 675, also held that the same nonprofit corporation that referred a child for a foster placement—despite having a "special relationship" with that child—did not have a duty to protect the child from sexual assault by someone in the foster family's home absent its actual knowledge of the assaulter's propensity to engage in such an assault. (*Id.* at pp. 682-683.)

Third, limiting a regional center's duty to protect against sexual assault of a consumer by a vendor employee to instances in which the regional center has actual knowledge of the employee's proclivity for such assaults is supported by the Lanterman Act and its implementing regulations. The Act obligates regional centers to adopt "best practices" with regard to their "administrative practices and services" that do not "[e]ndanger a consumer's health or safety" (§ 4620.3, subds. (a) & (g)(1)) and empowers the centers to "provide direct treatment and therapeutic services" to consumers in "emergency situations" (but

24

not otherwise) (§ 4648, subd. (f)); thus, the Act contemplates that a regional center cannot *itself* knowingly take actions that create danger to consumers and must also take action to provide services to consumers when the center *learns* of an "emergency situation" (which would ostensibly include a danger of sexual assault). Similarly, the regulations under the Act authorize a regional center to terminate a vendor's contract upon a "determin[ation] that continued utilization of the vendor threatens the health and safety of the consumer[]" (Cal. Code Regs., tit. 17, § 54370, subd. (b)(7)), and such a determination necessarily presupposes actual knowledge of the danger. Thus, the Act contemplates that a regional center must take action upon acquiring knowledge of a threat to a consumer—and gives the center tools to protect the consumer and still provide the consumer with services and support.

Fourth, several decisions outside the context of referral agencies have keyed the existence of a duty to protect against sexual assault or other criminal behavior by a third party to the defendant's actual knowledge of the third party's proclivity to engage in such behavior. (See *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 152, 156; *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1093-1095; see also *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678-679 [a premises owner is liable for injuries to invitees caused by a third party's criminal acts only if the owner is aware of "similar incidents of violent crime" on its premises], overruled on other grounds by *Reid v. Google, Inc.* (2010) 50 Cal.4th 512; *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1190-1191 [same], overruled on other grounds by *Reid*.)

Because it is undisputed that the Regional Center did not have any knowledge of Ocampo's proclivities to engage in sexual assault—and, to the contrary, because the record indicates that Ocampo had no criminal history and because there is no evidence that Ocampo had engaged in any questionable behavior during the four and a half years between his hire by Round Trip and the rape in this case—the Regional Center did not owe A.L. a duty to protect against the sexual assault alleged in this case.

## III.    A.L.'s Further Arguments

A.L. resists our conclusion with what boils down to three further arguments.

First, A.L. argues that a duty that is triggered only upon a defendant's actual knowledge is no longer permitted after *Brown*, *supra*, 11 Cal.5th 204, because *Brown* requires that the assessment of whether a duty exists under the *Rowland* factors must be conducted "'at a relatively broad level of factual generality'" (*id.* at p. 221); defining a duty to turn on a particular defendant's particular knowledge about a particular third party's proclivities for criminal conduct, A.L. reasons, is too "case-specific."  A.L. cites two recent decisions that appear to adopt this line of reasoning and to disagree with *J.L.*, *supra*, 177 Cal.App.4th 388, and *Doe*, *supra*, 37 Cal.App.5th 675.  (See *Roman Catholic Archbishop*, *supra*, 70 Cal.App.5th at pp. 677-678; *Lawndale*, *supra*, 72 Cal.App.5th at pp. 126-130.)

Although *Roman Catholic Archbishop* and *Lawndale* seem to adopt this line of reasoning, we respectfully disagree with their holdings that *Brown* precludes a duty to protect triggered by an alleged tortfeasor's actual knowledge of a third party's propensity to commit a criminal act.  *Brown* requires that the *Rowland* factors be analyzed "'at a relatively broad level of factual

26

generality.'" The *Rowland* analysis we set forth above is conducted at that level of generality because it asks whether, as a general matter, regional centers should be liable for injuries to a consumer resulting from a sexual assault committed by a vendor's employee. Although we conclude that such a duty exists only in that category of cases when a regional center has actual knowledge of that employee's propensity to engage in the criminal act of sexual assault, *the policy analysis of duty that we have undertaken* is not tied to any case-specific facts; the case-specific facts only come into play when we assess whether *this* particular case falls within the category where a duty exists— that is, when we conclude that the undisputed fact of the regional center's lack of actual knowledge *in this case* precludes the existence of a legal duty to protect A.L. for purposes of her negligence claim. To conclude that a duty of care can never be limited to situations in which the defendant has actual knowledge because the knowledge limitation constitutes an impermissible specificity that runs afoul of *Brown* is to conclude that all tort duties can never be qualified or delimited. Applying this approach in this case would not only overturn all of the precedent cited above that delimits tort duties based on the defendant's actual knowledge, but would also render regional centers liable for all harm to consumers inflicted by anyone at any time. We do not think that tort law must be painted with such clumsy strokes; such an approach is inconsistent with our Supreme Court's mandate that we calibrate tort law to the proper balance of societal good versus societal harm.[14]

---

14      We do not disagree with the *outcomes* of *Roman Catholic Archbishop* or *Lawndale*, which ground their duties to protect on the defendant's control over the sexual offender and the

27

Second, A.L. argues that we may not look to the scope of obligations imposed on regional centers by the Act in defining a regional center's duty of care because doing so confuses the *standard* of care with the *duty* of care. To be sure, a statutorily defined *standard* of care does not, by itself, obligate a court to recognize a *duty* of care. (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 935 ["The standard of care *presupposes* a duty [of care]; it cannot *create* one"].) But our analysis does not look to standards of care set forth in the Act to create—or delimit the scope of—a regional center's duty of care under tort law. (Cf. *Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1087 ["statutory compliance" is not often a "defense to tort liability"].) We look to the Act solely to ascertain the role regional centers are supposed to play in the provision of services and support under the Act, and thereby to understand the public policy the Act embodies. We then assess whether imposing tort liability would further or instead hinder that public policy. Based on the *Rowland*-factors analysis, we have limited tort liability to those circumstances in which tort liability would further the public policy underlying the Act, and have prohibited tort liability in the broader circumstances in which it would hinder the Act's purposes.

Third and lastly, A.L. argues that the Act expresses the "intent of the Legislature that persons with developmental disabilities shall have [a] right to be free from harm, including . . . abuse[] or neglect." (§ 4502, subd. (b)(8).) That consumers have a right to be free from abuse or neglect does not create a legal duty *of regional centers* to protect consumers from all abuse or

premises—which are important facts missing from the duty question presented in this case.

28

neglect they may suffer at the hands of others, including the employees of vendors. The right and the duty are not automatically flip sides of the same coin, and our analysis of the pertinent public policy considerations confirms that they should not be.

\*      \*      \*

What happened to A.L. in this case is undeniably tragic. However, were we to accept A.L.'s position that a regional center is liable for sexual assault committed against a consumer by a vendor's employee based only on a center's alleged negligence in not monitoring the vendor closely enough, we would effectively convert regional centers into insurers of all harm to consumers and, because they are neither funded nor staffed to undertake that vast liability, would effectively shut those centers down. This, too, would be devastating, albeit for a different reason— namely, because it would deny essential services and support to the entire population of developmentally disabled persons who rely upon those services to live fulfilling and meaningful lives. Our Legislature has the power to restructure the system for the provision of services and support under the Lanterman Act; unless and until it does, we will not use tort law to do so.

## DISPOSITION

The judgment is affirmed.  The Regional Center is entitled to its costs on appeal.

### **CERTIFIED FOR PUBLICATION**.


_____, J.
HOFFSTADT

We concur:


_____, P. J.
 LUI


_____, J.
 ASHMANN-GERST